UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DANIEL T.,[1]

                            Plaintiff

-vs-

COMMISSIONER OF SOCIAL
SECURITY,

                            Defendant.
_____

DECISION and ORDER

6:20-CV-6582 CJS

## INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant")

which denied the application of Plaintiff for Social Security Disability Insurance ("SSDI")

benefits.   Now before the Court is Plaintiff's motion (ECF No. 17) for judgment on the

pleadings and Defendant's cross-motion (ECF No. 19) for the same relief.   For the

reasons discussed below, Plaintiff's application is granted, Defendant's application is

denied, and this case is remanded to the Commissioner for further administrative action.

## STANDARDS OF LAW

The Commissioner decides applications for SSDI benefits using a five-step

sequential evaluation:

> A five-step sequential analysis is used to evaluate disability claims. *See* 20
> C.F.R. §§ 404.1520, 416.920.   First, the Commissioner considers whether
> the claimant is currently engaged in substantial gainful activity. If he is not,

---

[1] The Court's Standing Order issued on November 18, 2020, indicates in pertinent part that, "[e]ffective immediately, in opinions filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), in the United States District Court for the Western District of New York, any non-government party will be identified and referenced solely by first name and last initial."

the Commissioner next considers whether the claimant has a severe impairment which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in the regulations [or medically equals a listed impairment].  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity [("RFC")] to perform his past work.[2] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.   The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at step five.

*Colvin v. Berryhill*, 734 F. App'x 756, 758 (2d Cir. 2018) (citations and internal quotation marks omitted).

An unsuccessful claimant may bring an action in federal district court to challenge the Commissioner's denial of the disability claim.  In such an action, "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C.A. § 405(g) (West).   Further, Section 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."

The issue to be determined by the court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *see*

---

[2] Residual functional capacity or RFC "is what the claimant can still do despite the limitations imposed by his impairment." *Bushey v. Berryhill*, 739 F. App'x 668, 670–71 (2d Cir. 2018) (citations omitted); *see also*, 1996 WL 374184, Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996).

*also, Barnaby v. Berryhill*, 773 F. App'x 642, 643 (2d Cir. 2019) ("[We] will uphold the decision if it is supported by substantial evidence and the correct legal standards were applied.") (citing *Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010) and *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).").

"First, the [c]ourt reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard." *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999).   However, not every legal error by an ALJ requires reversal.   Rather, an error may be deemed harmless unless it prejudices the plaintiff by negatively affecting the outcome of the ALJ's decision. *See, Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) ("[W]here an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ. Failure to apply the correct legal standards is grounds for reversal.") (citation omitted).[3]

If the Commissioner applied the correct legal standards, or if any legal error was harmless, the court next "examines the record to determine if the Commissioner's conclusions are supported by substantial evidence." *Tejada v. Apfel*, 167 F.3d at 773.

---

[3] *See also, Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 9 (2d Cir. 2017) ("[W]e agree that any such error was harmless, since Monroe has not identified any prejudice and the record establishes that the error did not affect the ALJ's decision."); *Suttles v. Colvin*, 654 F. App'x 44, 47 (2d Cir. 2016) ("[A]ssuming that the Appeals Council erred, there was nevertheless no reasonable possibility that consideration of Dr. Liotta's report would have altered the ALJ's decision, because the evidence that Dr. Liotta adduced was not materially different from that which was already before the ALJ and the vocational expert when they reached their conclusions."); *but compare, Greek v. Colvin*, 802 F.3d 370, 376 (2d Cir. 2015) ("Dr. Wheeler provided the ALJ with an opinion that Greek . . . would likely be absent from work more than four days per month as a result of his impairments or treatment.   . . .   Because a vocational expert in this case testified that Greek could perform no jobs available in large numbers in the national economy if he had to miss four or more days of work per month, the ALJ's failure to provide adequate reasons for rejecting Dr. Wheeler's opinion was not harmless.").

Substantial evidence is defined as "more than a mere scintilla.   It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (citation omitted).

> The substantial evidence standard is a very deferential standard of review— even more so than the 'clearly erroneous' standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder would have to conclude otherwise." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original). "An ALJ is not required to discuss every piece of evidence submitted, and the failure to cite specific evidence does not indicate that such evidence was not considered." *Id*.

*Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), as amended (Apr. 30, 2019) (internal quotation marks omitted).

In applying the substantial-evidence standard, a court is not permitted to re-weigh the evidence. *See, Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) ("Krull's disagreement is with the ALJ's weighing of the evidence, but the deferential standard of review prevents us from reweighing it."); *see also, Riordan v. Barnhart*, No. 06 CIV 4773 AKH, 2007 WL 1406649, at *4 (S.D.N.Y. May 8, 2007) ("The court does not engage in a *de novo* determination of whether or not the claimant is disabled, but instead determines whether correct legal standards were applied and whether substantial evidence supports the decision of the Commissioner.") (citations omitted).

## FACTUAL and PROCEDURAL BACKGROUND

The reader is presumed to be familiar with the facts and procedural history of this action.   The Court will refer to the record only as necessary for purposes of this Decision and Order.

Plaintiff filed an application for SSDI benefits, claiming that he became disabled on August 2, 2018, due to generalized anxiety, depression, agoraphobia, obsessive compulsive disorder, panic disorder, hypertension, migraine headaches and fatigue. Tr. 229.   Of those impairments, the record indicates that the most serious by far were his anxiety and panic disorder.   Indeed, at the administrative hearing in this matter, Plaintiff acknowledged that he is physically able to work, and that it is his anxiety that prevents him from doing so. Tr. 52.

The record indicates that Plaintiff, who was born in 1984, began experiencing anxiety and panic attacks around age 21, when he began feeling panicky and anxious in crowds at taverns.   Plaintiff indicates that his anxiety subsequently caused him difficulty in maintaining employment. Tr. 63.   Although, the record indicates that Plaintiff maintained regular employment up to the alleged disability onset date. Tr. 55, 206-207. In fact, during the ten years leading up to the alleged disability onset date in August, 2018, Plaintiff remained with the same employer and was promoted from an entry-level position to supervisor. Tr. 53.   In that supervisor's position, however, Plaintiff was reprimanded on at least one occasion for excessive absenteeism, which he attributes to his mental-health symptoms.

In 2009, Plaintiff sought mental health treatment, and reported a long history of anxiety and panic symptoms. Tr. 496.   Plaintiff began treatment with W. Glenn Jamison, M.D. ("Jamison"), who, by 2011, reported that Plaintiff was doing much better on medication (diazepam), was in "good remission" from symptoms and was "basically doing well." Tr. 506, 510, 514.   In July 2011, Jamison noted that Plaintiff was being discharged

because he had withdrawn from treatment. Tr. 520.

In or about February 2017, Plaintiff complained of increased symptoms, consisting of "anxiety and anticipatory anxiety about having a panic attack." Tr. 527.   Plaintiff was treated by Michael Susco, M.D. ("Susco"), who noted that Plaintiff had "initially presented with signs and symptoms consistent with panic disorder." Tr. 527.   Plaintiff indicated that he was worried and preoccupied about the future.   On March 7, 2017, Susco reported that Plaintiff was "responding adequately" to a combination of Celexa and Ativan and "progressing as expected." Tr. 539.   In June 2017, Plaintiff reported having increased anxiety concerning several events in his life, including having a new job and expecting a new baby. Tr. 545.   However, by August 2017, Plaintiff reported feeling "very well," except for "some anxiety in the morning," and noted that he had just purchased a new home. Tr. 547.   Susco reported normal mental status examination findings, including euthymic mood, normal attention and concentration and intact memory. Tr. 548-549.

However, by January 2018, Plaintiff reported worsening anxiety. Tr. 25.   In early June 2018, Plaintiff went to the emergency room complaining of panic attacks that interfered with his ability to perform his duties at home and at work. Tr. 25.   On June 12, 2018, Susco reported that Plaintiff was complaining of "acute exacerbation of his anxiety" and of being "preoccupied with current life stressors," namely: "infant son, recent marriage, purchasing a house, stable job." Tr. 557, 565.   Plaintiff indicated that his medications had become ineffective. Tr. 25.   Plaintiff also felt discouraged about his obesity. Tr. 557.   On June 26, 2018, Plaintiff complained of increasing anxiety and isolation, and of not wanting to leave his house, though he was still employed full-time.

Tr. 560.   Plaintiff appeared anxious and expressed feelings of helplessness, but his mental status examination was otherwise normal. Tr. 561-562.   Susco's diagnosis at that time was panic disorder with agoraphobia. Tr. 564.

Also, in June, 2018, Plaintiff complained to his primary care doctor, Seung Hur, M.D. ("Hur") about panic attacks that were disrupting his ability to fulfill responsibilities at home and at work. Tr. 364.

On July 30, 2018, Monifi Osmen, NP ("Osmen") reported that Plaintiff was complaining about continued panic attacks and the ineffectiveness of his medications. Tr. 369.   Osmen started Plaintiff on buspar for anxiety and referred him to a pain clinic, to be evaluated for the use of medical marijuana. Tr. 376.   On August 3, 2018, Osmen noted that Plaintiff was continuing to complain of panic attacks.   In particular, Plaintiff indicated that he had "several" panic attacks during the previous month that interfered with his work as a supervisor at a residence for persons with developmental disabilities, and that he was seeking short-term disability. Tr. 378.   (Plaintiff never returned to that job.)   Osmen outlined a plan to have Plaintiff discontinue his current medications and switch to Lexapro. Tr. 379.

On September 12, 2018, Plaintiff told Osmen that he was doing well and that his medications were effective, though he had anxiety when thinking about returning to work. Tr. 26.   However, on September 28, 2016, Plaintiff told Osmen that he was having "severe and unrelenting anxiety and depression due to recent life changes," and that his medications were not effective. Tr. 27.   Osmen adjusted Plaintiff's medications and recommended that he begin mental health therapy. Tr. 27.   On October 9, 2018, Osmen

reported that Plaintiff was continuing to complain of symptoms and seeing "no benefit" from the prescribed anti-depressant medications. Tr. 27.

On September 20, 2018, Stephen Farmer, Psy.D. ("Farmer") performed a psychiatric evaluation of Plaintiff at the Commissioner's request. Tr. 489-492.   Farmer reported Plaintiff's various subjective complaints, including having panic attacks four or five times per week. Tr. R. 489-490.   However, the results of Farmer's own examination were essentially normal, except that Plaintiff seemed "somewhat anxious" and had "mildly impaired" attention and concentration. Tr. 489-491.   Farmer indicated, in pertinent part, that Plaintiff would have only moderate limitation interacting with people, regulating emotions, controlling behavior and maintaining well being; and only mild-to-moderate limitation sustaining an ordinary routine and regular attendance at work. Tr. 491.

On October 16, 2018, Hur completed a statement concerning Plaintiff's physical work limitations. Tr. 572-575.   Hur essentially indicated that Plaintiff was physically capable of working, but that depression and anxiety would likely affect his ability to concentrate more than half of every day and cause him to miss more than four days of work per month.

On October 17, 2018, Plaintiff established care with Terri Haskins, FNP-C ("Haskins"), to be evaluated for use of medical marijuana to treat his mental health symptoms. Tr. 27.   Haskins reported that Plaintiff was complaining of a long history of anxiety and panic disorder with multiple unsuccessful medication trials, and that he appeared anxious, disheveled and sad. Tr. 27, 577.   Plaintiff reportedly told Haskins that his mental health "started to crumble" in May 2018, when his father-in-law died. Tr. 577.

8

Haskins certified Plaintiff to receive medical marijuana. Tr. 27.   A week after this initial examination, on October 25, 2018, Haskins completed a mental RFC form, which in pertinent part indicated that "25% or more of the time" Plaintiff would be unable to understand and remember, interact socially, sustain concentration, persistence and pace, and tolerate stress. Tr. 843-845.   Haskins also indicated that Plaintiff could not work for more than four hours at a time and that he would likely miss more than four days per month due to mental health symptoms. Tr. 846.   Haskins noted that her opinion was based on having seen Plaintiff once, at which time he had cried and appeared "very unstable." Tr. 846.

On October 29, 2018, Plaintiff was evaluated by Janice Masterson, MS ("Masterson"), a speech language pathologist, in connection with starting cognitive therapy. Tr. 755.   Masterson reported that Plaintiff complained of depression, anxiety and panic attacks that prevented him from working, and that he "wept multiple times" during the session. Tr. 755.   Plaintiff indicated that he desperately needed help but that his medications did not "seem to work for any length of time." Tr. 755.   Based on testing performed that day, Masterson concluded that Plaintiff had "severe" cognitive impairments in the areas of reasoning, problem solving and thought organization, and noted, in pertinent part:

> Not able to cope, frequent loss of emotional control, not able to work, not able to reason through his thoughts and situations   . . . He appears to have had a steady decline in his abilities to reason through situations, see thing clearly, unable to see positive aspects of events.   He has exhausted the pharmacological potential that have been provided by his medical team. Formal skilled cognitive treatment is indicated and medically necessary to improve cognitive processes to a functional level.

9

Tr. 756.   Plaintiff continued to treat with Masterson into 2019, over the course of fifteen sessions of cognitive behavioral therapy.   Masterson noted that Plaintiff was an ideal candidate for cognitive behavioral therapy who made good progress during those sessions. *See, e.g.*, Tr. 758 ("He appears to be showing signs of improvements after 2 sessions."); 770 ("Patient has demonstrated significant improvement in this past month . . .   However, [he] still struggles with some everyday problems.").   Masterson noted that Plaintiff was successfully implementing cognitive behavioral techniques into his life and felt well enough to begin vocational training to become a barber, though he still had problems with anxiety and concern over finances. Tr. 775-776.

On January 1, 2019, Haskins reported that she had seen Plaintiff for follow up, and that he seemed much improved due to his therapy with Masterson and his use of medical marijuana for his anxiety. Tr. 605.   Haskins indicated that Plaintiff seemed to show a 50% improvement since she had first seen him in October 2018. Tr. 605.   Plaintiff expressed interest in resuming employment, but doubted whether he could ever return to his old job. Tr. 605.   Haskins' diagnoses were post-traumatic stress disorder,[4] chronic; generalized anxiety disorder; and major depressive disorder, recurrent, moderate. Tr. 608.

On January 24, 2019, Osmen reported that Plaintiff's anxiety was "well managed," although Plaintiff had recently gone to the emergency room for a panic attack, at which time his dosage of Effexor had been increased. Tr. 781. Plaintiff reported no additional panic attacks. Tr. 781.

---

[4] Evidently, the precipitating trauma for this diagnosis was that one of Plaintiff's high school classmates perished in a car accident, not involving Plaintiff, thirteen years earlier. Tr. 579.

10

On March 20, 2019, Osmen reported that Plaintiff was having increased anxiety about attending barber-training school, which was about to begin. Tr. 792.   Osmen noted that Plaintiff endorsed being depressed and anxious, Tr. 792, but had normal mood, affect, behavior and judgment. Tr. 795.

On March 25, 2019, Masterson reported that Plaintiff had met his goals for therapy and was being discharged from treatment. Tr. 779.

On May 6, 2019, Osmen indicated that Plaintiff's medications were effective in controlling his anxiety and panic disorder. Tr. 800.   Plaintiff reported doing well in barber school. Tr. 800.

In or about August 2019,[5] Plaintiff completed his vocational training to become a barber, although he indicated that he missed several classes, which he later made up, due to anxiety.   Plaintiff subsequently worked part-time, filling in on an as-needed basis for a barber.

On January 3, 2020, Osmen reported that Plaintiff's "anxiety has been much better controlled," and that he "ha[d] slowly been trying to cut down on his medication regimen." Tr. 820.   Plaintiff, though, still reported "intermittent episodes of panic, however much less problematic than previously." Tr. 820.   A mental status examination was negative for depression and anxiety. Tr. 821.

On February 13, 2020, Osmen saw Plaintiff again and noted, "His anxiety and depression continue to be problematic for him, he is working with various specialists."[6]

---

[5] Tr. 800.
[6] The identity of these "various specialists" is unclear to the Court, as it does not recall seeing records from such providers.

Tr. 828.   That same day, Osmen completed an RFC evaluation form for Plaintiff. Tr. 837-842.   Similar to Haskin's earlier report, Osmen indicated that "25% or more of the time" Plaintiff would be unable to understand and remember, interact socially, sustain concentration, persistence and pace, and tolerate stress; that he could not work for more than four hours at a time; and that he would miss more than four days of work per month due to his impairments. Tr. 840. Tr. 840, 843-845.   Indeed, as discussed further below, the Court observes that overall, Osmen's report is an almost verbatim restatement of Haskin's report written in October 2018.   Osmen stated that the signs and symptoms supporting her opinion were difficulty concentrating, emotional lability, headaches and anxiety. Tr. 840.

On April 3, 2020, a hearing was held before an Administrative Law Judge ("ALJ"), at which Plaintiff appeared with his attorney.   At that time Plaintiff was 35 years of age and had completed high school and one year of college. Tr. 48-49.   The ALJ took testimony from Plaintiff, Plaintiff's wife and a vocational expert ("VE").   The ALJ also received written statements from Plaintiff's wife and mother.

On April 14, 2020, the ALJ issued a decision finding that Plaintiff was not disabled at any time between the alleged onset date, August 2, 2018, and the date of the decision. (Tr. 15-37).   Applying the sequential evaluation, the ALJ found, in pertinent part, that Plaintiff had not engaged in substantial gainful activity during the relevant period; that he had severe impairments consisting of obesity, heart arrythmias, depressive disorder, anxiety disorder, and post-traumatic stress disorder; that those impairments, either singly in combination, did not meet or medically equal a listed impairment; that Plaintiff had the

RFC to perform medium work involving simple and routine instructions, occasional interaction with co-workers and supervisors but no interaction with the public; that Plaintiff could not perform his past relevant work; but that Plaintiff could perform other jobs.

In making her RFC finding, the ALJ first reviewed all of the evidence of record in a thorough and concise manner. Tr. 22-31.   The ALJ then indicated that she had considered Plaintiff's statements about the severity his impairments in accordance with 20 CFR § 404.1529 and SSR 16-3p, and found them not entirely consistent with the evidence.   The ALJ also indicated that she had considered the opinion evidence in accordance with 20 CFR § 404.1520c.   Regarding the opinion evidence, the ALJ indicated, in pertinent part, that she found Farmer's consultative opinion persuasive, but did not find the treating opinions of Haskins and Osmen persuasive.   The ALJ, however, provided only a brief explanation for those findings.   In particular, the ALJ stated, in pertinent part, that Farmer's findings and conclusions were "supported by the record as a whole," and were therefore persuasive, while the opinions of Haskins and Osmen were "not supported by the record as a whole and particularly [with their] own treatment notes," and were therefore not persuasive. Tr. 33, 34, 35.

On August 10, 2020, Plaintiff filed the subject action, contending that the Commissioner's decision denying benefits must be reversed for the following reasons: 1) the ALJ failed to properly assess the medical opinion evidence as required by 20 CFR § 404.1520c, and, in particular, failed to address one opinion from a state-agency review physician, K. Liber-Diaz, Psy. D. ("Liber-Diaz"); erred in finding that the opinions of Osmen and Haskins were unpersuasive because they were not supported by the authors' own

treatment notes; gave inordinate weight to "objective findings," such as normal findings from mental status exams during office visits;[7] overlooked evidence when asserting that there was no evidence of emergency crisis intervention, emotional dysregulation or uncontrolled behaviors, and failed to explain how this evidence squared with the opinion of Farmer, the only opinion which the ALJ found persuasive; failed to provide an adequate explanation for how the opinions were evaluated for persuasiveness, and, in particular, failed to explain how Farmer's opinion was consistent with his own findings and with the rest of the evidence, including the opinions of Osmen and Haskins; erroneously found that Plaintiff's partial improvement in 2019 and 2020 was inconsistent with the opinions of Osmen and Haskins;[8] failed to discuss whether the opinions of Osmen and Haskins were consistent with the non-medical evidence; and failed, when evaluating the opinion evidence, to consider the relationship between the medical opinion providers and Plaintiff, and relied too heavily on the opinion of Farmer that was based on a one-time consultative examining relationship; 2) the ALJ failed to properly assess Plaintiff's RFC, and, in particular, overlooked factors set forth in 20 CFR 404.1520a(c)(2); failed, when discussing Plaintiff's activities of daily living, to consider that they were performed in a highly structured setting unlike a typical work setting; improperly "rejected" statements from

---

[7] Plaintiff states: "Instead of focusing upon the claimant's appearance at his treatment sessions, the ALJ should have engaged in a stress evaluation.   That is, she was required to consider what precipitates and/or aggravates the claimant's symptoms pursuant to the factors listed in 20 CFR § 404.1529(c)(3)." Pl. Reply, ECF No. 20 at p. 9.

[8] Plaintiff notes, for example, that Osmen was obviously aware of Plaintiff's improvement but nevertheless opined that he would still be unable to function for approximately 25% of a workday due to anxiety. ECF No. 17-2 at p. 26.   On this point, the Court understands Plaintiff to be contending that the ALJ improperly relied on her own lay interpretation of the medical evidence of improvement when concluding that Osmen's opinion was inconsistent with such improvement.

Plaintiff's wife and mother; failed to consider that despite some improvement in Plaintiff's condition he still experienced exacerbations of his symptoms, and did not discuss how such exacerbations might affect Plaintiff's ability to work; and inconsistently limited Plaintiff to no interaction with the public but occasional interaction with co-workers and supervisors; and 3) the ALJ failed to properly assess Plaintiff's symptoms, and, in particular, erred in "relying mainly" on objective medical evidence, to the exclusion of other evidence that was consistent with Plaintiff's subjective complaints; erred in asserting that the statements from Plaintiff's wife and mother were not consistent with the other evidence; attached too much significance to Plaintiff's ability to perform daily activities that do no relate to a work setting; improperly relied on Plaintiff's alleged "significant improvement" while disregarding evidence of his ongoing symptoms; failed to consider Plaintiff's excellent work history, including the fact that he continued working between 2016 and 2018 despite having significant bouts of anxiety; and failed to discuss the consistency the evaluation of Plaintiff's complaints as required by SSR 16-3p(2)(c)&(d). Plaintiff maintains that the matter should be remanded solely for the calculation of benefits.

Defendant disputes Plaintiff's arguments and maintains that the Commissioner's decision is free of reversible legal error and supported by substantial evidence. Defendant contends, rather, that Plaintiff is simply demanding that the Court re-weigh the evidence, which is not permitted.

The Court has carefully reviewed and considered the parties' submissions.

DISCUSSION

<u>The ALJ's Evaluation of the Medical Opinion Evidence</u>

The ALJ's decision rests largely on her determination that the opinion of Farmer, a consultant who examined Plaintiff on one occasion, was more persuasive than the opinions of Osmen and Haskins, who each treated Plaintiff for more than a year.   The Court finds, however, that the ALJ erred in failing to give good reasons for her finding in that regard, and that remand is therefore required.

"A consultative examiner's opinion may constitute substantial evidence if otherwise supported by the record." *Grega v. Saul*, 816 F. App'x 580, 582–83 (2d Cir. 2020) (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983)).   However, the Second Circuit has "previously cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination," *Selian v. Astrue*, 708 F.3d 409, 419 (2d Cir. 2013) (citation omitted), and has particularly emphasized this point in the context of cases of mental illness, which may involve a "fluctuating state of mental health":

> We have frequently "cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination." *Selian*, 708 F.3d at 419. This concern is even more pronounced in the context of mental illness where . . . a one-time snapshot of a claimant's status may not be indicative of her longitudinal mental health.

*Estrella v. Berryhill*, 925 F.3d 90, 98 (2d Cir. 2019) (Observing that the ALJ erred in relying on the consultative opinion without considering the claimant's "fluctuating state of mental health.").

The Second Circuit has further indicated that an ALJ also should not, when dealing with a mental health condition that is cyclical or fluctuating, rely on "a few isolated instances of improvement" as proof that a claimant is capable of working:

> Cycles of improvement and debilitating symptoms of mental illness are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working.   When viewed alongside the evidence of the apparently cyclical nature of Estrella's depression, the ALJ's two cherry-picked treatment notes do not provide good reasons for minimizing Dr. Dron's opinion.

*Estrella v. Berryhill*, 925 F.3d at 97 (citations and internal quotation marks omitted); *see also, Colgan v. Kijakazi*, 22 F.4th 353, 362 (2d Cir. 2022) ("[T]he ALJ found that Dr. Ward's diagnosis of "anxious mood, emotional lability, perseverative speech, and impaired concentration" was contradicted by her treatment records which showed that, on certain occasions, Colgan did not appear to present those infirmities.  . . .   What the ALJ here did, by cherry-picking particular instances of improvement from Dr. Ward's treatment notes in order to create an inconsistency within her medical opinion, was precisely what we deemed erroneous in *Estrella*.").

In the instant case, Plaintiff's claim turns primarily on the severity of his anxiety and panic disorder, conditions which, in his case, tended to fluctuate based on external life stressors, such as the death of his father-in-law and the responsibilities of marriage and parenthood, and the waning effectiveness of his medications over time.   As the ALJ observed, Plaintiff maintained that his panic attacks occurred sporadically and without warning: "These episodes occur sporadically throughout the week.   He is unable to

identify triggers to panic attacks." Tr. 22.   The ALJ also noted that even while Plaintiff was receiving treatment for anxiety and panic attacks, his mental status examinations during office visits with treating professionals were often normal. See, Tr. 24 ("Mental status exam was normal."); *id*. ("Mental status exam was normal except for anxious mood.").   An exception to this was on February 8, 2017, when Plaintiff appeared so anxious that Susco directed him to take an Ativan pill during an office visit. Tr. 529.

Consequently, Farmer's opinion, based on a single examination on a single day, was, at best, a snapshot of a claimant's status that may well not have been indicative of his longitudinal mental health.   Nor, for that matter, did Farmer's report indicate the extent to which he took Plaintiff's statements[9] concerning the sporadic nature of his symptoms, and the severity of those symptoms when they did occur, into account when formulating his medical opinion.   It is not clear, therefore, that Farmer's findings and conclusions are supported by the record as a whole.   The ALJ did not discuss these potential shortcomings of Farmer's report when weighing the opinion evidence.

The ALJ also did not discuss the fact that Farmer's report was potentially stale by the time of the hearing, since it was written on September 20, 2018, just two months into the 20-month period at issue in this case, during which Plaintiff's symptoms varied.[10]   *See, e.g., Benjamin F. v. Comm'r of Soc. Sec.*, No. 1:20-CV-0929-TPK, 2021 WL 5149739, at *7 (W.D.N.Y. Nov. 5, 2021) ("[O]n remand, the ALJ must consider the extent to which Dr.

---

[9]  *See*, Farmer's report, Tr. 489 (listing Plaintiff's subjective complaints).
[10]  The issue before the ALJ was whether Plaintiff was disabled at any time between August 2, 2018, and April 14, 2020. Tr. 37.

Liu's [consultative] opinion predated much of the relevant medical evidence - almost four years elapsed, and two surgeries occurred, between his evaluation and the date on which the ALJ found Plaintiff to be disabled - and, of course, Dr. Liu's opinion (which in itself is relatively vague as to specific functional limitations) comes from a one-time examiner and conflicts with contemporaneous and later treating source opinions."); *but see, Robert J. R. v. Comm'r of Soc. Sec.*, No. 1:19-CV-0627-TPK, 2021 WL 4437174, at *4 (W.D.N.Y. Sept. 28, 2021) ("It is true that the state agency reviewer's opinion was rendered fairly early on in the administrative process (although it followed Dr. Ippolito's consultative examination) and that there are additional records of mental health treatment which neither of those sources had an opportunity to consider. However, it is not error to rely on an opinion that predates additional medical evidence if that evidence does not indicate any material change in the claimant's medical condition or the severity of his symptoms."); *Holmberg v. Comm'r of Soc. Sec.*, No. 615CV1022GTSWBC, 2016 WL 6091245, at *4 (N.D.N.Y. Sept. 21, 2016) ("Although Dr. Tabb is a licensed pediatrician and only examined Plaintiff one time early in the application process, the ALJ properly concluded that Dr. Tabb's opinion was consistent with the longitudinal medical record[.]"), report and recommendation adopted sub nom. *Holmberg v. Colvin*, No. 615CV1022GTSWBC, 2016 WL 6090873 (N.D.N.Y. Oct. 18, 2016).   Indeed, Plaintiff's condition seems to have worsened after Farmer's examination, and then improved somewhat.

For these reasons, the Court finds that remand is required.   However, the Court does not find that remand solely for calculation of benefits is warranted.   In that regard, "[r]emand for calculation of benefits is appropriate only in cases where the record provides

persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose." *Gallagher v. Comm'r*, No. 17CV1270, 2019 WL 442450, at *5 (W.D.N.Y. Feb. 5, 2019) (citing *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980) and *Butts v. Barnhart*, 388 F.3d 377, 385-86 (2d Cir. 2004), quotation marks omitted).

In arguing that remand for calculation of benefits is warranted here, Plaintiff relies heavily on the opinions of Haskins and Osmen that Plaintiff is incapable of full-time sustained employment.   However, the Court has serious doubts about the probative value of either of those opinions.   In the first place, and similar to Farmer's report, Haskin's report is arguably an unreliable "snapshot" of Plaintiff's condition, since Haskins authored the report after seeing Plaintiff on just one occasion.   Moreover, the single office visit upon which Haskins based her report is arguably not a reliable indicator of Plaintiff's overall condition, since it is the one at which his symptoms were at their worst. Haskins subsequently acknowledged that Plaintiff's symptoms quickly improved, as much as by 50%, with medication and therapy.   Haskins' report was also written very early in the period at issue, before Plaintiff began cognitive therapy and the new medication regimen that led to his improvement.   Consequently, Haskins' report is not strong evidence of Plaintiff's disability.

The issue with Osmen's report, meanwhile, is that it appears to be a mere re-presentation of Haskins' report.   As mentioned earlier, Osmen's report written in February 2020 is an almost verbatim restatement of Haskin's report written in October 2018.   Indeed, the similarity between the two reports is striking, especially considering

they were written almost sixteen months apart.   For example, when asked to state Plaintiff's diagnosis, Osmen, on essentially the same form that Haskins had used, wrote the exact same wording and abbreviation as Haskins. Tr. 840, 846.   Additionally, the reader will recall that Haskins wrote her report immediately after seeing Plaintiff in the midst of an emotional crisis, and wrote, "The state in which I saw the pt was awful.   He cried the entire visit- very unstable." Tr. 846. Osmen wrote something very similar: "Pt has continued to struggle, last visit he was very emotionally unstable." Tr. 840.   The problem with this, however, is that Osmen's office note from the visit to which she refers does not indicate that Plaintiff was at all unstable. Tr. 828-829.     Furthermore, similar to Haskins, Osmen also wrote that none of Plaintiff's medications had benefited him. Tr. 841.   However, while that statement might have been true when Haskins wrote her report, it was not true when Osmen wrote her report.   Rather, by that time Plaintiff had reported significant improvement with his newly-prescribed medications, including medical marijuana.   Osmen's report was therefore arguably not representative of, or consistent with, her own treatment notes.   In short, it appears that Osmen's report is also of questionable value in establishing Plaintiff's claim of disability.

The Court therefore finds that remand solely for calculation of benefits is not warranted since the present record does not necessarily contain such "persuasive proof of disability" that no purpose would be served by remanding for further proceedings. *See, Demars v. Comm'r of Soc. Sec.*, 841 F. App'x 258, 263 (2d Cir. 2021) (remand solely for calculation of benefits warranted where the record provided persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose).

21

CONCLUSION

For the reasons discussed above, Plaintiff's motion for judgment on the pleadings (ECF No. 17) is granted, Defendant's cross-motion (ECF No. 19) is denied, and this matter is remanded to the Commissioner for further proceedings consistent with this Decision and Order pursuant to sentence four of 42 U.S.C. § 405(g).   The Clerk of Court is directed to enter judgment and close this case.

So Ordered.

Dated: Rochester, New York
      March 30, 2022

ENTER:

CHARLES J. SIRAGUSA
United States District Judge

22